The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hedrick and upon the briefs and argument of counsel. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. On the date of plaintiff's alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant.
3. Defendant was a duly qualified self-insured employer.
4. An Industrial Commission Form 18, Notice of Accident to Employer, marked as Plaintiff's Exhibit Number One, is admitted into evidence for the purpose set forth in the parties' Pre-Trial Agreement.
5. Plaintiff's Exhibits Two through Eight, Twenty through Twenty-Six and Twenty-Eight through Thirty-One, are admitted into evidence.
6. A set of exhibits identified in the parties Pre-Trial Agreement as Defendant's Exhibits One through Nine are admitted into evidence.
7. Plaintiff was out of work from 31 May 1994 through 4 July 1994, from 21 November 1994 through 8 January 1995 and from 19 April 1995 through 11 July 1995.
8. Plaintiff's average weekly wage can be calculated by the Commission from the Form 22 submitted by Defendant.
* * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission rejects the findings made by the Deputy Commissioner and makes the following:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was forty-eight years old, married and the mother of one child. Plaintiff, who has a high school degree and is certified in x-ray technology and cardiovascular technology, first went to work for defendant in February 1969. She started as an x-ray technologist, but now works as a Cardiovascular Specialist 1. Her performance appraisal for 1993-1994 was excellent: "Great job! Your quality service and dedication shows in your work habits. . . . Good job. Your extra efforts make the dept. a more enjoyable place to work." At the time of her injury on 1 February 1994 plaintiff's average weekly wage was $855.26, yielding a compensation rate of $466.00 per week.
2. Although Mrs. Best has had various problems with her shoulders over the years, in early 1992, she first experienced bursitis in her right shoulder. She sought treatment for this bursitis from Dr. Robert T. Wyker, an orthopedic surgeon whose practice focuses primarily on shoulders. He started her on a strengthening program, prescribed her anti-inflammatory medications, and gave her cortisone injections. The conservative treatment was successful and he essentially ceased treating Mrs. Best's right shoulder in September 1992.
3. Because, however, Mrs. Best had been favoring her right shoulder, she had inflicted added stress on her left shoulder and, as a result, began experiencing pain in her left shoulder. Dr. Wyker treated Mrs. Best's left shoulder through February 1993. Mrs. Best had "little if any trouble" with either shoulder between February 1993 and January 31, 1994. She missed no work and did not have to seek medical attention. As of January 31, 1994, she considered the condition of her right shoulder to be "good."
4. On February 1, 1994, Mrs. Best was walking briskly at work when she collided with a ceiling-mounted monitor. Her shoulder hit the corner of the monitor. She felt severe pain and fell to the floor. Another employee helped her up and she continued to work, expecting the pain to fade. Instead, the shoulder continued to hurt throughout the day.
5. The incident at work on February 1, 1994 involving her collision with the monitor, was an interruption of her normal work routine and constituted an injury by accident arising out of and in the course of her employment with defendant-employer.
6. In mid-afternoon on February 1, 1994, Mrs. Best was sent to the employee health department and on February 2, 1994, she went to the Emergency Room. She had suffered a shoulder contusion the size of an egg. Her arm was tender and had discoloration. She was prescribed Darvocet for her pain. The emergency room physician's findings were consistent with a shoulder injury.
7. The pain Mrs. Best suffered after the collision was qualitatively different from her prior shoulder pain. She was able to continue working, but only because of the pain medication and the help of her co-workers. The co-workers assisted her with her lead apron, took her turn at the scrub table, hung film magazines for her, and placed items in the cabinets she could not reach.
8. Despite this assistance, Mrs. Best's right shoulder pain worsened. She returned to the employee health department nurse, who recommended that she see an orthopedist.
9. She had an appointment with Dr. Wyker on February 23, 1994 for evaluation of her right shoulder. He noted that although Mrs. Best had been taking muscle relaxants, she continued to have pain over the posterior portion of her right shoulder with some pain extending into her arm. She also had a "funny sensation" in her hand at times. He recommended physical therapy, anti-inflammatory medications, and cortisone injections.
10. Physical Therapy Services of Johnston Co., Inc. provided Mrs. Best with physical therapy from March 1, 1994 through July 1994. On March 1 — a month after the accident — the therapist noted that Mrs. Best still had "severe pain and spasm and decreased ROM and strength due to injury to right shoulder at work." On March 3, Mrs. Best began doing exercises, but still had pain and a decreased range of motion and strength. On March 9, Mrs. Best had begun to exhibit a modicum of improvement: "She was able to do some things around the house without discomfort. She feels that she is beginning to feel better and her movement is improving." Mrs. Best was, however, still taking pain medication and anti-inflammatory drugs.
11. On March 11, 1994, Mrs. Best went to Lake Royale with her family where they had a camping lot. Her family was making a bench on their dock; Mrs. Best watched and helped by handing the workers items such as nails and pencils. Someone moved a board, hitting Mrs. Best in the shin. She lost her balance and fell into the water. She did not strike her shoulder. At first, she noticed primarily discomfort in her leg. Later, her right shoulder became stiff and sore and it was more painful to move her arm.
12. On March 14, 1994, Mrs. Best visited one of Dr. Wyker's partners. The doctor noted that Mrs. Best had a decreased range of motion and increased pain, but no numbness, tingling, or weakness. He gave Mrs. Best a sling and Flexeril.
13. On the next day, at physical therapy, the therapist also noted muscle spasms with decreased range of motion. Two days later, however, Mrs. Best had improved: she had less pain with movement and her cervical range of motion was within normal limits. The muscle spasms were also decreased.
14. Dr. Wyker saw Mrs. Best again on March 23, 1994 and noted that Mrs. Best's symptoms had improved over the last two weeks. Mrs. Best still, however, had "a lot of discomfort with any kind of motion of the shoulder." Dr. Wyker, who believed that Mrs. Best was suffering from bursitis, recommended that Mrs. Best continue with her physical therapy, which she did with significant success.
15. On March 24, she began again to do exercises and the therapist noted that "[p]atient was feeling better today." On March 28, Mrs. Best was able to do light activities without causing severe pain, was "showing gradual improvement and is beginning to increase her activities." She had thus regained the same level of improvement attained less than three weeks earlier, immediately prior to her fall in the lake.
16. This improvement continued steadily. In fact, on April 5, 1994, Mrs. Best was doing so well, she called and canceled her therapy appointment. The therapist wrote: "[H]er shoulders are not bothering her." Mrs. Best tried, however, to progress too fast. On April 11, she had to return to physical therapy: "Patient had been doing better, but with increase in activity and no therapy, she has had an exacerbation of symptoms." The therapist later concluded that while Mrs. Best's shoulder would improve for a short time, increased work and activity would then cause her symptoms to return.
17. On May 19, Dr. Wyker became concerned that Mrs. Best was still experiencing discomfort. Since conservative treatment had not completely resolved Mrs. Best's problems, he recommended surgery.
18. During the surgery, on May 31, 1994, Dr. Wyker found bursitis "or inflammation" in the right shoulder and a partial rotator cuff tear. He addressed the bursitis by shaving the bone to give the muscle more room to work and then cleaning out the inflamed tissue. For the tear, he excised the weak area of the tendon portion of the muscle and repaired it with sutures.
19. Mrs. Best was not able to perform her job from the date of the surgery, May 31, through July 1, 1994. During that time, she continued in physical therapy, progressing into more active exercising and a strengthening program to regain motion and strength. The physical therapy lasted through September 28, 1994, but Mrs. Best's right shoulder discomfort persisted.
20. An arthrogram in September 1994 revealed a partial rotator cuff tear that Dr. Wyker believed was a recurrence of the previous tear or a further injury resulting from Mrs. Best's physical therapy. He, therefore, recommended a second surgery. This surgery took place on November 21, 1994 and was essentially identical to the prior surgical procedure. Because of this surgery, Mrs. Best remained out of work from November 21, 1994 through January 8, 1995. Dr. Wyker released Mrs. Best to return to work on January 9, but barred her from lifting more than five pounds, from holding arterial pressures with the right arm, and from wearing a lead apron. Mrs. Best worked within these limitations until April 19, 1995.
21. At that point, defendant announced to Mrs. Best that she could no longer continue in her current position because she could not perform CPR. Defendant told her that she could either move into one of two available positions or take a leave of absence under the Family Medical Leave Act. These two positions — for which, oddly, Mrs. Best did not have the minimum qualifications — paid substantially less ($9.27 per hour and $7.83 per hour) than Mrs. Best's Cardiovascular Specialist position ($19.57 per hour).
22. Defendant's Vice President revealed to Mrs. Best that if she accepted one of the two offered positions, her transfer would be permanent — she would not be allowed later to return to her Cardiovascular Specialist position. Defendant's human resources personnel did not tell Mrs. Best anything to the contrary. As a result, Mrs. Best elected to take a leave of absence. Mrs. Best returned to work on July 12, 1995 and has since been able to perform her regular duties without any loss of wages.
23. Nevertheless, Mrs. Best has continued to experience shoulder pain. Dr. Wyker has prescribed additional medication for strain involving the rotator cuff muscles. He believes that this pain represents an aggravation of her condition and is related to the two prior surgeries.
24. In this case, only one doctor, Dr. Wyker, provided relevant evidence. Defendant offered no rebuttal testimony. Dr. Wyker's testimony was unwavering, despite cross-examination: In his opinion, "her symptoms of pain and weakness in that shoulder which subsequently led to the need for surgery, was related to her injury of February 1st, 1994." He repeated: "The reason for the surgery was persistent pain that was not responsive to conservative treatment. And her symptoms were brought on by [the February 1, 1994] accident. And therefore I think the accident did cause her symptoms that eventually led to the surgery." Finally, after cross-examination suggesting that Mrs. Best's surgeries arose out of prior conditions or the fall at the lake, Dr. Wyker confirmed that his opinion was unaltered. The injury on February 1, 1994 "was certainly a significant contributing factor to her symptoms that resulted in her needing surgery."
25. Plaintiff's injury by accident on 1 February 1994 aggravated a pre-existing but non-symptomatic condition, resulting in two surgeries and her inability to work and earn wages for various periods of time through July 12, 1995.
* * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. At the time of her injury on 1 February 1994 plaintiff's average weekly wage was $855.26, yielding a compensation rate of $466.00 per week.
2. On 1 February 1994, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant which materially aggravated her previously non-symptomatic condition for the worse. N.C. Gen. Stat. §97-2(6). Further, the March 11, 1994 incident at the lake temporarily increased her pain symptoms, but was not the proximate cause of plaintiff's need for surgery or subsequent disability.Id.
3. As a result of her February 1, 1994 injury by accident and resulting surgeries, plaintiff is entitled to be paid by defendant temporary total disability compensation at the rate of $466.00 per week for the periods of May 31 through July 4, 1994, November 21, 1994 through January 8, 1995, and from April 19, through July 11, 1995
4. As a result of her February 1, 1994 injury by accident, plaintiff is entitled to have defendant pay for of all medical expenses incurred in connection therewith, including the two surgeries performed. N.C. Gen. Stat. § 97-2(19); N.C. Gen. Stat. § 97-25.
5. Defendant is not entitled to any credit against compensation due for benefits paid plaintiff during a portion of these periods under the defendant's Paid Days Off (PDO) program. Defendant is not entitled to a credit for these amounts since this was a benefit plaintiff "had earned and for which she had not been paid for", and a benefit which will not result in duplicative payments for her injury. Estes v. North Carolina StateUniversity, 102 N.C. App. 52, 401 S.E.2d 384 (1991) (state not entitled to credit against workers' compensation for accumulated compensatory time, vacation and sick leave).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusion of law the Full Commission reverses the holding of Deputy Commissioner Hedrick and enters the following:
AWARD
1. As the result of plaintiff's injury by accident, defendant shall pay to plaintiff temporary total disability compensation benefits at the rate of $466.00 per week for the periods of May 31 through July 4, 1994, November 21, 1994 through January 8, 1995, and from April 19, through July 11, 1995, less the attorney fee hereinafter provided.
2. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff for treatment resulting from her injury by accident of 1 February 1994 including the subsequent operations.
3. That part of the compensation that has already accrued shall be paid to plaintiff in a lump sum, subject to the attorney fee hereafter awarded.
4. An attorney fee of twenty-five percent of the compensation herein allowed is hereby approved and awarded to plaintiff's attorney for his services to the plaintiff. With respect to compensation that had already accrued, the attorney fee is to be deducted and paid directly to said attorney. Thereafter, defendant shall pay every fourth compensation payment directly to said attorney.
5. Defendant shall pay the costs, including $470.00 to Dr. Wyker as an expert witness fee.
 S/ __________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ __________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ __________________ BERNADINE S. BALLANCE COMMISSIONER